DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE SNODGRASS, State Bar #148137
VINCE CHHABRIA, State Bar #208557
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:     (415) 554-4674
Facsimile:      (415) 554-4747

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

STEPHEN P. BERZON, State Bar #46540
SCOTT A. KRONLAND, State Bar #139669 State Bar #171693
STACEY LEYTON, State Bar #203827
ALTSHULER BERZON, LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone:     (415) 421-7151
Facsimile:      (415) 362-8064

Attorneys for Intervenors
SAN FRANCISCO CENTRAL LABOR COUNCIL, ET AL.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN GATE RESTAURANT ASSOCIATION, an incorporated non-profit trade association,<br><br>    Plaintiff,<br><br>  vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO and Does 1 through 15, inclusive,<br><br>    Defendants,<br><br>  and<br><br>SAN FRANCISCO CENTRAL LABOR COUNCIL, SERVICE EMPLOYEES INTERNATIONAL UNION ("SEIU") LOCAL 1021, SEIU UNITED HEALTHCARE WORKERS-WEST, and UNITE-HERE!, LOCAL 2,<br><br>    Intervenors. | Case No. C06-6997 JSW<br><br>**EX PARTE APPLICATION FOR STAY PENDING APPEAL** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ..............................................................................................................................1

BACKGROUND ...............................................................................................................................2

        A.     San Francisco's Health Care Crisis ...............................................................2

        B.     The San Francisco Health Care Security Ordinance...................................3

                1.     The government health program......................................................3

                2.     The employer spending requirement ...............................................4

        C.     The Lawsuit ..................................................................................................7

STANDARD OF REVIEW ................................................................................................................7

DISCUSSION ...................................................................................................................................9

      I.     THE CITY IS HIGHLY LIKELY TO SUCCEED ON THE MERITS, BECAUSE EMPLOYERS MAY READILY COMPLY WITH THE ORDINANCE WITHOUT ALTERING OR ADOPTING AN ERISA PLAN.......9

      II.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF ALLOWING THE CITY TO IMPLEMENT THE EMPLOYER SPENDING REQUIREMENT WHILE THE APPEAL IS PENDING. ....................................................................................................................11

CONCLUSION................................................................................................................................14

# TABLE OF AUTHORITIES

**Federal Cases**

*Cleghorn v. Blue Shield of Cal.*
   408 F.3d 1222 (9th Cir. 2005) ..........................................................................................8

*DeCanas v. Bica*
   424 U.S. 351 (1976)..........................................................................................................11

*Hilton v. Braunskill*
   481 U.S. 770 (1987)..........................................................................................................8

*Lopez v. Heckler*
   713 F.2d 1432 (9th Cir.)
   463 U.S. 1328 (1983).............................................................................................7, 8, 13

*Miller v. Carlson*
   768 F.Supp. 1331 (N.D. Cal. 1991) ................................................................................13

*Natural Resources Defense Council, Inc. v Winter*
   502 F.3d 859 (9th Cir. 2007) ............................................................................................8

Operating Engineers Health & Welfare Trust Fund v. JWJ Contracting Co.
   135 F.3d 671 (9th Cir. 1998) ........................................................................................ 11

*Southern California IBEW-NECA Trust Funds v. Standard Industrial Electrical Co.*
   247 F.3d 920 (9th Cir. 2001) ..........................................................................................10

*United States v. Midway Heights County Water Dist.*
   695 F.Supp. 1072 (E.D. Cal. 1988) ................................................................................14

**State Statutes & Codes**

California Labor Code
   Section 226 ......................................................................................................................6

**San Francisco Statutes, Codes & Ordinances**

San Francisco Administrative Code
   Chapter 14........................................................................................................................3
   Section 14.1(b)(7) .........................................................................................................4, 5
   Section 14.1(b)(8) .............................................................................................................5
   Section 14.2(g)..................................................................................................................4
   Section 14.3(b)..................................................................................................................6

**Other References**

DPH, *Health Care Access: A Guide To Health Care Programs in San Francisco*
available at
http://www.sfdph.org/Reports/HlthCareAccess042007/HlthCareAccessBody042007.pdf ........3

John M. Glionna, *S.F. offering healthcare to neediest; Trailblazing city plan provides services regardless of residents' immigration status or medical history*
L.A. Times, Oct. 22, 2007, at B1 .......................................................................................1

Kevin Sack, *San Francisco Takes Unique Approach to Providing Medical Care for All*
N.Y. Times, Sept. 14, 2007 at A1 ......................................................................................1

**INTRODUCTION**

This ex parte stay application involves San Francisco's groundbreaking universal health care program – a program whose implementation is being watched closely throughout the country and could serve as a model for health care reform nationwide.[1]  The City, joined by intervenor-defendants, seeks a stay from this Court's order enjoining the employer spending mandate so that it may proceed with implementation of the program on January 2, 2008 as scheduled.  Without this stay, tens of thousands of San Francisco residents and workers will be deprived of critically necessary health care services – and will suffer the health-related and financial consequences – during the pendency of this appeal.  Due to the time-sensitive nature of this motion and the unavailability of the Court, the City is concurrently filing with the Ninth Circuit an emergency application pursuant to Circuit Rule 27-3 for a stay pending appeal.  The City has requested relief from the Ninth Circuit by December 31, 2007.

The City contends there is a strong likelihood it will succed on the merits of this appeal for the reasons set forth below.  Even if the Court disagrees, the City's appeal at least raises serious legal questions.  We include our merits-related contentions in this brief so that this Court is presented with the same arguments as will be presented to the Ninth Circuit Court of Appeals.

Moreover, the balance of hardships tip sharply in favor of allowing the City to implement the program during the appeal.  First and foremost, some 20,000 workers who currently lack coverage will be denied the health care benefits to which they are entitled under the Ordinance.  This deprivation will pose serious risks to the health of these workers, because those without benefits are significantly less likely to seek timely treatment or preventive care.  And those who do seek treatement – for example, for health care emergencies – will suffer serious financial consequences as a result.

---

[1] *See, e.g.,* Kevin Sack, *San Francisco Takes Unique Approach to Providing Medical Care for All*, N.Y. Times, Sept. 14, 2007 at A1; John M. Glionna, *S.F. offering healthcare to neediest; Trailblazing city plan provides services regardless of residents' immigration status or medical history*, L.A. Times, Oct. 22, 2007, at B1.

But the harm will not be limited to those workers. If a stay is not granted, tens of thousands of additional uninsured San Franciscans will be denied the ability to participate in the government program created by the Ordinance. While the Ordinance calls for this program to be open to all uninsured residents, without the employer mandate the City will only be able to make the program available to people who fall below 300% of the Federal Poverty Level. Thus, aside from the 20,000 workers discussed above, roughly 39% of San Francisco's uninsured residents will be denied the ability to enroll in the City's program, and, therefore, deprived of access to the comprehensive health care services the City would otherwise provide.

If the employer mandate is blocked, the City and its taxpayers will suffer as well. If 20,000 workers are denied the health expenditures that the Ordinance requires their employers to make, and if 39% of San Francisco's uninsured population becomes ineligible to participate in the new government program, the City would be required to foot the entire bill for any emergency treatment or other health care services those individuals without means to pay seek from San Francisco General Hospital or one of the City's health clinics.

## BACKGROUND

### A.    San Francisco's Health Care Crisis

Each year, roughly 82,000 San Francisco adults suffer from a lack of health insurance. Request for Judicial Notice in Support of San Francisco's Motion for Summary Judgment ("RJN") Exhibit D at 1. Aside from the obvious human suffering this causes, the health care crisis imposes a tremendous financial burden on the City and its taxpayers, requiring them to foot the bill for emergency treatment and other health care services. Declaration of Dr. Mitchell H. Katz in Support of San Francisco's Motion for Summary Judgment ("Katz Decl. in Support of SJ") at ¶ 7. The San Francisco Department of Public Health ("DPH") estimates that in Fiscal Year 2005 it spent $104 million to provide health care services to the uninsured. *Id*.

The above figures actually understate the severity of San Francisco's health care crisis, because they do not account for the thousands of uninsured people who live elsewhere but seek health care services from the City. In Fiscal Year 2006, DPH estimates it served approximately 5,300 uninsured individuals who do not live in San Francisco. Katz Decl. in Support of SJ at ¶ 8.

A common misconception about the uninsured is that they are "taken care of" because they qualify for state or federally funded health care programs for the indigent like Medi-Cal (California's Medicaid program). In reality, the large majority of the uninsured do not qualify for care under such programs. For example, an adult is only eligible for Medi-Cal if: (i) his household income falls below the Federal Poverty Level ("FPL"), which is just over $10,000 per year for a single person; <u>and</u> (ii) he is elderly, blind, disabled, or a single parent.[2] The 82,000 uninsured residents mentioned above do not include the people who are enrolled in San Francisco's indigent health care programs. Katz Decl. in Support of SJ at ¶ 6.

### B.   The San Francisco Health Care Security Ordinance

In 2006, to address the City's health care crisis, the San Francisco Board of Supervisors unanimously passed, and the Mayor signed into law, the San Francisco Health Care Security Ordinance ("HCSO" or "Ordinance").[3] The Ordinance has two key related components – a government health care program and an employer health spending requirement.

#### 1.   The government health program

First, the HCSO establishes a government health care program, operated by DPH, that revolutionizes the manner in which the City protects the health of its people. Its primary feature is the Health Access Program ("HAP"), which will deliver health care to its participants from a network consisting of San Francisco General Hospital, DPH clinics, and participating non-profit and private providers. S.F. Admin. Code § 14.2(a). The Ordinance provides that the HAP shall assign a primary care physician, nurse practitioner or physician assistant to each participant. S.F. Admin. Code §

---

[2] For a discussion of the programs available to San Francisco's indigent population and an explanation of their limited availability based on FPL and other factors, see DPH, *Health Care Access: A Guide To Health Care Programs in San Francisco*, available at http://www.sfdph.org/Reports/HlthCareAccess042007/HlthCareAccessBody042007.pdf.

[3] The currently operative version of the HCSO is attached as Exhibit A to the City's Request for Judicial Notice filed concurrently with its motion for summary judgment. The original version is attached as Exhibit D to the City's Request for Judicial Notice. Pertinent portions of the amended version are attached as Exhibit E to that Request for Judicial Notice. The Ordinance also is codified at Chapter 14 of San Francisco's Administrative Code, which is also available at http://www.municode.com/Resources/gateway.asp?pid=14131&sid=5. All citations are to the San Francisco Administrative Code except for the Board's declaration of findings and legislative intent, which are not codified.

14.2(e). And it requires that the HAP "provide medical services with an emphasis on wellness, preventive care and innovative service delivery." S.F. Admin. Code § 14.2(f). Among the specific services provided are inpatient and outpatient hospital services, diagnostic and laboratory services, radiological services, mental health services, home health care, and prescription drug benefits. *Id.*[4]

The value of this care is substantial – DPH estimates that in 2008 it will cost an average of $261 per participant per month to provide it. Katz Decl. in Support of SJ at ¶ 10. This is in comparison to the $379 cost of the average monthly insurance premium in California. *Id.* at ¶ 11.

The HAP, which is funded in part by the City's general fund, is available to uninsured San Francisco residents, regardless of whether they are employed or unemployed. Enrollees must pay quarterly participation fees, which are set on a sliding scale according to their household income as a percentage of the FPL. As set forth in the Katz Declaration in Support of Summary Judgment at ¶ 12, the rates are as follows:

| FPL: | 0-100% | 101-200% | 201-300% | 301-400% | 401-500% | 501%+ |
|---|---|---|---|---|---|---|
| Quarterly Participation Fee: | $0 | $60 | $150 | $300 | $450 | $675 |

Nonresidents who work in the City do not qualify for HAP participation. But the program contains a feature for those people as well: medical reimbursement accounts. The Ordinance authorizes DPH to establish and maintain such accounts for qualified nonresident employees who work in the City. S.F. Admin. Code §§ 14.1(b)(7), 14.2(g). Beneficiaries of this aspect of the City's program may draw from the account to obtain reimbursement for medical expenses, including payments of health insurance premiums. RJN Exh. C (DPH Reg. 7(g)(i)).

### 2. The employer spending requirement

The second key component of the HCSO, which does not become operative until January 2, 2008, is the employer spending requirement – a mandate that medium and large businesses make

---

[4] Incidentally, DPH has changed the name of the HAP program to "Healthy San Francisco" after determining that the name "Health Access Program" would create confusion among San Francisco residents because of its similarity to other programs. RJN Exh. C (DPH Reg. No. 1(b)). For purposes of this litigation the City will continue to use the name contained in the Ordinance.

minimum health expenditures on behalf of employees who work more than a specified number of hours. Specifically, in 2008 a private employer with 20-99 employees and a nonprofit with 50 or more employees must, for any employee who has been employed for 90 days and works more than ten hours per week, make health care expenditures of $1.17 per hour on behalf of that employee. S.F. Admin. Code § 14.1(b)(8); RJN Exh. B (OLSE Reg. No. 5.2(A)(2)). A private employer with 100 or more employees must make health care expenditures of $1.76 per hour on behalf of each covered employee. S.F. Admin. Code. § 14.1(b)(8); RJN Exh. B (OLSE Reg. No. 5.2(A)(1)).

It is entirely up to the employer to decide how to comply with this spending requirement. The Ordinance sets forth the following non-exclusive list of appropriate health care expenditures:

- Contributions to health savings accounts ("HSAs") as defined under Internal Revenue Code section 223 or "any other account having substantially the same purpose or effect";

- Direct reimbursement to employees "for expenses incurred in the purchase of health care services";

- Payments "to a third party for the purpose of providing health care services for covered employees";

- Costs incurred in the "direct delivery of health care services" to covered employees; and

- Payments by the employer to the City "to be used on behalf of covered employees."

S.F. Admin. Code § 14.1(b)(7). Elaborating on this last option – which we will refer to as the government payment option – the Ordinance states: "The City may use these payments to: (i) fund membership in the Health Access Program for uninsured San Francisco residents; and (ii) establish and maintain reimbursement accounts for covered employees, whether or not those covered employees are San Francisco residents." *Id*.

DPH has structured the program so that if an employer chooses to satisfy the health care spending requirement by making payments to the City, the employer need only write a check, and all employees on whose behalf the payment is made will be eligible to receive health care benefits. When covered employees enroll with DPH, the Department will place HAP-eligible employees into

the HAP, and will establish medical reimbursement accounts for those not eligible for the HAP. RJN Exh. C (DPH Reg. Nos. 7(c), 7(f), 7(g)).[5]

Covered employees who qualify for HAP membership will, if their employers choose to satisfy the spending requirement by paying the City, be entitled to enroll in the program at a 75 percent discount on the quarterly participation fees identified above. RJN Exh. C (DPH Reg. No. 7(f)). Furthermore, any covered employee whose fee, after the 75% discount, falls below $50 per quarter will simply be allowed to enroll for free. *Id.* Accordingly, the fees for covered employees are as follows:

| Poverty Level: | 0-100% | 101-200% | 201-300% | 301-400% | 401-500% | 501%+ |
|---|---|---|---|---|---|---|
| Quarterly Participation Fee: | $0 | $0 | $0 | $75 | $113 | $169 |

Katz Decl. in Support of SJ at ¶ 15.

Employers covered by the Ordinance are required to keep records of their health care expenditures so that San Francisco's Office of Labor Standards Enforcement ("OLSE") may enforce the employer spending requirement. S.F. Admin. Code § 14.3(b). The OLSE regulations describe in more detail the records that employers must maintain: (1) itemized pay statements, which are already mandated by California Labor Code section 226; (2) the address, phone number, and first day of work of each employee; and (3) records of health care expenditures made on behalf of covered employees. RJN Exh. B (OLSE Reg. No. 7.2). The employer must give the OLSE access to these records to facilitate the agency's enforcement duties. S.F. Admin. Code § 14.3(b).

According to the Controller's Office, the large majority of businesses with 20 or more employees – roughly 90% of them – already provide health care benefits to their employees. RJN Exh. F at 9.

---

[5] Generally speaking, covered employees who do not qualify for HAP membership will be nonresidents who work in San Francisco. Certain uninsured San Francisco residents (i.e., those who would qualify for Medi-Cal) also do not qualify for HAP participation. RJN Exh. C (DPH Reg. No. 3(a)).

## C. The Lawsuit

On November 8, 2006, plaintiff GGRA filed this lawsuit, seeking declaratory and injunctive relief on the theory that the HCSO's employer spending requirement is preempted by ERISA. A group of San Francisco labor organizations – San Francisco Central Labor Council, Service Employees International Union ("SEIU") Local 1021, SEIU United Healthcare Workers-West, and UNITE-HERE!, Local 2 – successfully intervened as defendants. Litigation was delayed when the Board of Supervisors decided to amend the Ordinance. As part of the amendments, the City pushed back the operative date of the employer spending requirement to January 2, 2008, in part to give the City time to get the program up and running, and in part to give employers sufficient preparation time to comply. Declaration of Mitchell M. Katz in Support of Emergency Application for Stay Pending Appeal ("Katz Decl. in Support of Stay") at ¶ 15. Accordingly, while the City has opened the HAP to a limited portion of the uninsured population with particularly low incomes, the program is not scheduled to be fully operational until 2008.

The parties filed cross-motions for summary judgment, and the district court heard argument on November 3, 2007. In support of its preemption argument, GGRA advanced two basic theories. First, it contended that the employer spending requirement forces employers to alter or amend their ERISA plans, thereby interfering with uniform plan administration. The City and the Intervenors responded that, because the Ordinance allows employers to comply with the spending requirement by paying the City rather than setting up an ERISA plan, it does not require employers to alter or amend their ERISA plans. Because this "government payment option" creates a meaningful compliance alternative that does not interfere with uniform administration of ERISA plans, Defendants argued, it falls within the category of the numerous state and local laws that the Supreme Court and this Court have upheld in the face of preemption challenges. This Court agreed with the GGRA.

## STANDARD OF REVIEW

"The standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir.), *stay modified on other grounds*, 463 U.S. 1328 (1983). Thus, courts weigh the following factors:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Natural Resources Defense Council, Inc. v Winter*, 502 F.3d 859, 863 (9th Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)) (emphasis removed).

The Ninth Circuit has approved of "two interrelated legal tests" for evaluating a request for a stay on appeal, which it has characterized as "represent[ing] the outer reaches of a single continuum." *Lopez*, 713 F.2d at 1435. "At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury." *Id.* "At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Id.*; *accord Natural Resources Defense Council*, 502 F.3d at 862.

When evaluating the parties' respective likelihood of success on the merits, this Court should apply a *de novo* standard to review of a ruling that a state or local law is preempted by ERISA. *See Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir. 2005).

In balancing the respective hardships to the parties, "preventable human suffering," or "deprivation of life's necessities," weighs more heavily than financial loss or administrative inconvenience. *Lopez*, 713 F.2d at 1437. And courts must consider whether retroactive relief can remedy hardships suffered by individuals deprived of an important public benefit. *Id.*

Furthermore, "[t]he public interest" must be considered separately from the hardships that will be suffered by the parties to the case. *Natural Resources Defense Council*, 502 F.3d at 862. This inquiry recognizes that "[o]ur society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges." *Lopez*, 713 F.2d at 1437. That is, "[i]t would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time." *Id.*

# DISCUSSION

## I. THE CITY IS HIGHLY LIKELY TO SUCCEED ON THE MERITS, BECAUSE EMPLOYERS MAY READILY COMPLY WITH THE ORDINANCE WITHOUT ALTERING OR ADOPTING AN ERISA PLAN.

This Court concluded that the employer mandate is preempted for two basic reasons.  First, it concluded that "[b]y mandating employee health benefit structures and administration, [the employer spending] requirements interfere with preserving employer autonomy over whether and how to provide employee health coverage, and ensuring national regulation of such coverage."  Order at 8.  This reasoning is contrary to Supreme Court and Ninth Circuit case law because it conflates the critical distinction between the regulation of health *plans* on the one hand, and health *benefits* on the other hand.  A local law may not impose requirements on ERISA plans, but it may impose general requirements relating to the provision of benefits, even if those types of benefits are mentioned in ERISA and are, as a practical matter, often provided through ERISA plans.  *See, e.g., Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11(1987) (explaining that Congress sought to preempt "state laws relating to *plans* rather than simply to *benefits*") (emphasis in original); *see also Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994).  Because San Francisco's ordinance requires employers to pay for *benefits* but allows them to do so without adopting an ERISA *plan* (or modifying an existing plan) it is not preempted.

The Court's order expressed concern that local expenditure mandates would require employers to make differing health care expenditures in different jurisdictions.  Order at 12-13.  However, "[c]ost uniformity was almost certainly not an object of pre-emption, just as laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans."  *Travelers*, 514 U.S. at 662.  So long as a local law permits an employer to maintain *plan* uniformity – as the HCSO clearly does – the possibility of cost disparity does not raise ERISA preemption issues.

Second, the Court held the requirements of the HCSO preempted because compliance is measured by the amount employers spend on health care, which could occur through an ERISA plan.  "In order to determine compliance," the Court stated, "the Ordinance necessarily refers to whether and how much an employer pays for employee health coverage under its existing plans, assuming

such employers maintain them at all." Order at 13. It is true that employers can establish compliance with the spending requirement by demonstrating that they make sufficient health care expenditures through an ERISA plan, but Ninth Circuit precedent makes clear that this is no ground for preemption: "The references to ERISA plans in the California prevailing wage law have no effect on any ERISA plans, but simply *take them into account* when calculating the cash wage that must be paid . . . . The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all." *WSB*, 88 F.3d at 794 (emphasis added). *See also Dillingham*, 519 U.S. at 324-35, 328; *cf. Funkhouser v. Wells Fargo Bank,* 289 F.3d 1137 (9th Cir. 2002) (state law claims not preempted by ERISA merely because a court would refer to an ERISA plan in calculating damages).

With respect, the Court's ruling did not give effect to the principle that while ERISA preempts state and local laws that impose mandates on ERISA plans, it does not preempt legal requirements that employers may readily satisfy without altering or adopting ERISA plans, because such requirements do not interfere with uniform plan administration. *See, e.g., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659 (1995); *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A.*, 519 U.S. 316, 333 (1997); *Southern California IBEW-NECA Trust Funds v. Standard Industrial Electrical Co.*, 247 F.3d 920, 925 (9th Cir. 2001) ("*Standard Industrial*"); *WSB Electric, Inc. v. Curry*, 88 F.3d 788, 795 (9th Cir. 1996). San Francisco's Ordinance falls squarely in this latter category. Employers are free to comply with the spending requirement by setting up ERISA plans if they wish, but they are also free to comply through non-ERISA means, including by making payments to the City. The Court recognized this, see Order at 10, but nonetheless concluded the Ordinance is preempted.

The Court's ruling also runs contrary to the Ninth Circuit's simplified test for ERISA preemption. That test inquires whether the local law: (a) tells employers how to write their ERISA plans or imposes conditions based on how they write their plans; or, alternatively, (b) tells employers that they must fulfill some independent requirement regardless of how they write their ERISA plans. The former type of law is preempted; the latter is not. *WSB*, 88 F.3d at 796. *See also Operating*

*Engineers Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 679 (9th Cir. 1998). The HCSO is clearly the latter type of law.

Finally, the Court's ruling raises federalism questions. Courts must be very hesitant to assume that Congress, in passing ERISA, meant to disturb the core power of state and local governments to protect the health and welfare of their people. As the Supreme Court has instructed, courts must start from the presumption that the local law is not preempted, and must find preemption only if Congress' intent to preempt is "clear and manifest." *Travelers*, 514 U.S. at 655. This Ordinance clearly represents an exercise of that core police power. *See, e.g., De Buono*, 520 U.S. at 814 fn. 10 ("the Court of Appeals rested its conclusion in no small part on the fact that the [statute] targets only the health care industry . . . . Rather than warranting pre-emption, this point supports the application of the starting presumption against preemption"); *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples"); *JWJ*, 135 F.3d at 677 ("ERISA pre-emption must have limits when it enters areas traditionally left to state regulation – such as the state's exercise of police powers and its regulation of health, safety, banking, securities, and insurance matters").

In light of the foregoing, the City can establish a likelihood of success on the merits. At the least, the appeal raises serious legal questions.

## II. THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF ALLOWING THE CITY TO IMPLEMENT THE EMPLOYER SPENDING REQUIREMENT WHILE THE APPEAL IS PENDING.

Without a stay, tens of thousands of San Franciscans will be forced to go without essential health care services during the pendency of this appeal, because their employers will not be required to make health care expenditures on their behalf and the City will not be able to expand HAP to all uninsured San Francisco residents. The harms that would result if the City were prevented from implementing the employer spending requirement on January 2, 2008 are numerous, serious, and irreparable. First and foremost, DPH estimates that some 20,000 workers who currently lack coverage will be denied the health care benefits to which they are entitled under the Ordinance. Katz

1   Decl. in Support of Stay at ¶ 10.  This prospective deprivation poses potentially serious risks to the
2   health of these workers, because those without benefits are significantly less likely to seek timely
3   treatment or preventive care.  *Id*. at ¶ 11.  Moreover, should these people become injured or seriously
4   ill while lacking health coverage, they could become destitute or be forced into bankruptcy as a result
5   of the medical costs they would be forced to incur.  *Id*.

6         The harm caused by preventing San Francisco from implementing the employer spending
7   requirement would not be limited to the estimated 20,000 workers discussed above.  To repeat, the
8   HAP is not merely available for workers whose employers make payments to the City.  The City also
9   plans to make HAP membership available, for a fee, to all uninsured San Francisco residents, as
10  contemplated by the Ordinance.  However, if the employer mandate is prevented from taking effect,
11  the City will be required to limit HAP enrollment to residents who fall below 300% of the Federal
12  Poverty Level.  *Id*. at ¶ 12.  Accordingly, aside from the 20,000 workers who would be denied
13  payment of health benefits by their employers, roughly 39% of uninsured residents will be denied the
14  ability to enroll in the HAP if the City is prevented from putting the employer spending requirement
15  into effect.  *Id*.

16        The fact that the denial of coverage to these people would impose a significant hardship is
17  demonstrated by the success of the City's program thus far.  Although the City has been unable to
18  open the HAP to all uninsured residents prior to the operative date of the employer spending
19  requirement, it has enrolled a subset of uninsured residents with especially low incomes.  The benefits
20  incurred by those people have been dramatic.  People previously denied health services are now
21  receiving primary care treatment from physicians or nurses.  They are receiving treatment for long-
22  neglected illnesses and injuries, and no longer need to rely unnecessarily on the City's emergency
23  health care system.  The financial and emotional burden of going without health coverage has been
24  lifted from them.  Indeed, the ability to enroll in the HAP may have saved the lives of people with
25  heart conditions, diabetes, and other ailments, and it is safe to assume that expanded HAP enrollment
26  in 2008 will do the same for more people.  Katz Decl. in Support of Stay at ¶ 13; *see also* fn 1, supra.

27        The City and its taxpayers would also suffer significant financial hardship if the spending
28  requirement is blocked.  If 20,000 workers are denied the health expenditures that the Ordinance

1   requires their employers to make, the City would be required to foot the entire bill for any emergency
2   treatment or other health care services these people seek from San Francisco General Hospital or one
3   of the City's health clinics.  Katz Decl. in Support of Stay at ¶ 14.

4       The City has gone to great lengths and undertaken great expense to be ready to implement the
5   employer spending requirement on January 2, 2008.  It has upgraded and reprogrammed its HAP
6   eligibility and enrollment system to allow it to enroll employees who are participating as a result of
7   the employer spending requirement.  It has hired new staff to facilitate communications with
8   employers who wish to comply with the Ordinance through the government payment option.  It is in
9   the process of training all enrollment staff to understand the relationship between the employer
10  spending requirement and HAP participation.  It has selected a vendor and set up a system to
11  administer health reimbursement accounts for employees who do not qualify for HAP participation.
12  *Id.* at ¶¶ 15-16.

13      Weighed against these hardships to the workers, the City and the public at large is the fact that
14  employers covered by the Ordinance would be required to pay for health benefits for their workers
15  during the pendency of the appeal.  But as discussed at pp. 7-8, *supra*, the Ninth Circuit has made
16  clear that the deprivation of benefits that would alleviate human suffering imposes a hardship that
17  vastly outweighs financial costs that would be incurred by the opposing party.  *See Lopez*, 713 F.2d at
18  1437.  *See also Miller v. Carlson*, 768 F.Supp. 1331, 1339 (N.D. Cal. 1991) (". . . the balance of
19  hardships strongly favors plaintiffs who will be deprived of essential benefits"); *United States v.*
20  *Midway Heights County Water Dist.*, 695 F.Supp. 1072, 1077 (E.D. Cal. 1988) (balancing "financial
21  difficulties" against "preventable human suffering" and resolving stay application in favor of the
22  latter).  What's more, the companies that are required to make health care expenditures on behalf of
23  their employees will receive a benefit, because those workers will be eligible for comprehensive
24  health benefits as a result.  Accordingly, the City, the uninsured, and the public at large would suffer
25  irreparable harm should a stay not issue, and the balance of hardships weighs heavily in favor of
26  allowing the program to move forward on January 2, 2008.

27
28

## CONCLUSION

The Court should grant the application for a stay of its ruling so that the City may implement the employer spending requirement beginning January 2, 2008.

Dated: December 27, 2007

>                               DENNIS J. HERRERA
>                               City Attorney
>                               WAYNE SNODGRASS
>                               VINCE CHHABRIA
>                               Deputy City Attorneys
>
>                               STEPHEN P. BERZON
>                               SCOTT A. KRONLAND
>                               STACEY M. LEYTON
>                               ALTSHULER BERZON LLP
>
>
>                    By:_____/S/_____.
>                               VINCE CHHABRIA
>
>                               Attorneys for Defendant
>                               CITY AND COUNTY OF SAN FRANCISCO